# BETHLEHEM STEEL CO. ET AL. v. NEW YORK STATE LABOR RELATIONS BOARD.

Argued December 16, 17, 1946.—Decided April 7, 1947.

*Bruce Bromley* argued the cause for appellants in No. 55. With him on the brief were *Daniel J. Kenefick, John H. Morse* and *Lyman M. Bass.*

*John G. Buchanan* argued the cause for appellant in No. 76. With him on the brief were *William J. Kyle, Jr., Stanley A. McCaskey, Jr.* and *John G. Buchanan, Jr.*

*William E. Grady, Jr.* argued the cause for appellees. With him on the brief was *Philip Feldblum.*

By special leave of Court, *Robert L. Stern* argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Acting Solicitor General Washington, Gerhard P. Van Arkel, Morris P. Glushien* and *Mozart G. Ratner.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

These appeals challenge the validity of the Labor Relations Act of the State of New York as applied to appellants to permit unionization of their foremen. Conflict is asserted between it and the National Labor Relations Act and hence with the Commerce Clause of the Constitution.

After enactment by Congress of the National Labor Relations Act, July 5, 1935, 49 Stat. 449, 29 U. S. C. § 151, *et seq.,* New York adopted a State Labor Relations Act

following the federal pattern. Laws of New York, 1937, Chap. 443, 30 McKinney's Consolidated Laws of New York, §§ 700–716. In the administrative boards they create, the procedures they establish, the unfair labor practices prohibited, the two statutes may be taken for present purposes to be the same. But in provision for determination of units of representation for bargaining purposes, the two Acts are not identical. Their differences may be made plain by setting forth § 9 (b) of the Federal Act, with that part which is omitted from the State Act in brackets and additions made by the State Act as amended, Laws of New York, 1942, Chap. 518, in italics:

> "The Board shall decide in each case whether, in order to insure to employees the full benefit of their right to self-organization [and] to collective bargaining, and otherwise to effectuate the policies of this Act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, *multiple employer unit,* craft unit, plant unit, or [subdivision thereof] *any other unit; provided, however, that in any case where the majority of employees of a particular craft shall so decide the board shall designate such craft as a unit appropriate for the purpose of collective bargaining.*"

The procedures prescribed for the two boards for investigation, certification, and hearing on representation units and for their election are substantially the same except that the State law adds the following limitation not found in the Federal Act: ". . . provided, however, that the board shall not have authority to investigate any question or controversy between individuals or groups within the same labor organization or between labor organizations affiliated with the same parent labor organization." Laws of New York, 1937, Chap. 443, as amended, Laws 1942, Chap. 518, 30 McKinney's Consolidated Laws of New York, § 705.3.

The two boards have at times pursued inconsistent policies in applying their respective Acts to petitions of foremen as a class to organize bargaining units thereunder. The State Board has in these cases recognized that right; the National Board for a time recognized it. *Union Collieries Coal Co.,* 41 N. L. R. B. 961; *Godchaux Sugars, Inc.,* 44 N. L. R. B. 874. Later, there was a period when, for policy reasons but without renouncing jurisdiction, it refused to approve foremen organization units. *Maryland Drydock Co.,* 49 N. L. R. B. 733; *Boeing Aircraft Co.,* 51 N. L. R. B. 67; *General Motors Corp.,* 51 N. L. R. B. 457. Now, again, it supports their right to unionize. *Packard Motor Car Co.,* 61 N. L. R. B. 4, 64 N. L. R. B. 1212; *L. A. Young Spring & Wire Corp.,* 65 N. L. R. B. 298. The foremen of these appellants, at a time when their desire to organize was frustrated by the policy of the National Board, filed applications with the State Board. It entertained their petitions and its policy permitted them as a class to become a bargaining unit. Both employers, by different methods adequate under State law to raise the question, challenged the constitutionality of the State Act as so applied to them. Their contentions ultimately were considered and rejected by the New York Court of Appeals and its decisions sustaining state power over the matter were brought here by appeals.

Both of these labor controversies arose in manufacturing plants located in New York where the companies employ large staffs of foremen to supervise a much larger force of labor. But both concerns have such a relation to interstate commerce that, for the reasons stated in *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, federal power reaches their labor relations. On this basis the National Board has exercised power to certify bargaining agents for units of employees

other than foremen of both companies. *Matter of Allegheny Ludlum Steel Corporation*, Case No. III–R–411, N. L. R. B., June 29, 1942; *Matter of Bethlehem Steel Corp. and C. I. O.*, 30 N. L. R. B. 1006, 32 N. L. R. B. 264, 1941 (production and maintenance employees); *Matter of Bethlehem Steel Corp. and A. F. of L.*, 47 N. L. R. B. 1330, 1943 (plant protection employees); *Matter of Bethlehem Steel Corporation and C. I. O.*, 52 N. L. R. B. 1217, 1943 (employees in order department); *Matter of Bethlehem Steel Co. and A. F. of L.*, 55 N. L. R. B. 658, 1944 (fire department employees). The companies contend that the National Board's jurisdiction over their labor relations is exclusive of state power; the State contends on the contrary that while federal power over the subject is paramount, it is not exclusive and in such a case as we have here, until the federal power is actually exercised as to the particular employees, State power may be exercised.

At the time the courts of the State of New York were considering this issue, the question whether the Federal Act would authorize or permit unionization of foremen was in controversy and was unsettled until our decision in *Packard Motor Car Co.* v. *N. L. R. B.*, 330 U. S. 485. Whatever constitutional issue may have been presented by earlier phases of the evolution of the federal policy in relation to that of the State, the question now is whether, Congress having undertaken to deal with the relationship between these companies and their foremen, the State is prevented from doing so. Congress has not seen fit to lay down even the most general of guides to construction of the Act, as it sometimes does, by saying that its regulation either shall or shall not exclude state action. *Cf.* Securities Act of 1933, § 18, 48 Stat. 85, 15 U. S. C. § 77r; Securities Exchange Act of 1934, § 28, 48 Stat. 903, 15 U. S. C. § 78bb; United States Warehouse

Act, § 29, before and after 1931 amendment, 39 Stat. 490, 46 Stat. 1465, 7 U. S. C. § 269. Our question is primarily one of the construction to be put on the Federal Act. It long has been the rule that exclusion of state action may be implied from the nature of the legislation and the subject matter although express declaration of such result is wanting. *Napier* v. *Atlantic Coast Line R. Co.*, 272 U. S. 605.

In determining whether exclusion of state power will or will not be implied, we well may consider the respective relation of federal and state power to the general subject matter as illustrated by the case in hand. These companies are authorized to do business in New York State, they operate large manufacturing plants in that state, they draw their labor supply from its residents, and the impact of industrial strife in their plants is immediately felt by state police, welfare and other departments. Their labor relations are primarily of interest to the state, are within its competence legally and practically to regulate, and until recently were left entirely to state control. Thus, the subject matter is not so "intimately blended and intertwined with responsibilities of the national government" that its nature alone raises an inference of exclusion. Cf. *Hines* v. *Davidowitz*, 312 U. S. 52, 66.

Indeed, the subject matter is one reachable, and one which Congress has reached, under the federal commerce power, not because it is interstate commerce but because under the doctrine given classic expression in the *Shreveport* case, Congress can reach admittedly local and intrastate activities "having such a close and substantial relation to interstate traffic that the control is essential or appropriate to the security of that traffic, to the efficiency of the interstate service, and to the maintenance of conditions under which interstate commerce may be conducted upon fair terms and without molestation or hindrance."

*Houston & Texas Ry.* v. *United States,* 234 U. S. 342, 351. See also *National Labor Relations Board* v. *Fainblatt,* 306 U. S. 601.

In the National Labor Relations Act, Congress has sought to reach some aspects of the employer-employee relation out of which such interferences arise. It has dealt with the subject or relationship but partially, and has left outside of the scope of its delegation other closely related matters. Where it leaves the employer-employee relation free of regulation in some aspects, it implies that in such matters federal policy is indifferent, and since it is indifferent to what the individual of his own volition may do we can only assume it to be equally indifferent to what he may do under the compulsion of the state. Such was the situation in *Allen-Bradley Local* v. *Board,* 315 U. S. 740, where we held that employee and union conduct over which no direct or delegated federal power was exerted by the National Labor Relations Act is left open to regulation by the state. However, the power of the state may not so deal with matters left to its control as to stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hill* v. *Florida,* 325 U. S. 538, 542. *Cf. Maurer* v. *Hamilton,* 309 U. S. 598. When Congress has outlined its policy in rather general and inclusive terms and delegated determination of their specific application to an administrative tribunal, the mere fact of delegation of power to deal with the general matter, without agency action, might preclude any state action if it is clear that Congress has intended no regulation except its own. *Oregon-Washington Co.* v. *Washington,* 270 U. S. 87. In other cases, Congress has passed statutes which initiate regulation of certain activities, but where effective regulation must wait upon the issuance of rules by an administrative body. In the interval before those rules are established,

774

this Court has usually held that the police power of the state may be exercised. *Northwestern Bell Telephone Co. v. Nebraska State Commission,* 297 U. S. 471; *Welch Co. v. New Hampshire,* 306 U. S. 79. But when federal administration has made comprehensive regulations effectively governing the subject matter of the statute, the Court has said that a state regulation in the field of the statute is invalid even though that particular phase of the subject has not been taken up by the federal agency. *Napier v. Atlantic Coast Line R. Co.,* 272 U. S. 605. However, when federal administrative regulation has been slight under a statute which potentially allows minute and multitudinous regulation of its subject, *cf. Atlantic Coast Line R. Co. v. Georgia,* 234 U. S. 280, or even where extensive regulations have been made, if the measure in question relates to what may be considered a separable or distinct segment of the matter covered by the federal statute and the federal agency has not acted on that segment, the case will be treated in a manner similar to cases in which the effectiveness of federal supervision awaits federal administrative regulation, *Northwestern Bell Telephone Co. v. Nebraska State Commission, supra; Welch Co. v. New Hampshire, supra.* The states are in those cases permitted to use their police power in the interval. *Terminal Railroad Assn. v. Brotherhood of Railroad Trainmen,* 318 U. S. 1. However, the conclusion must be otherwise where failure of the federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute. *Napier v. Atlantic Coast Line,* 272 U. S. 605; compare *Oregon-Washington Co. v. Washington,* 270 U. S. 87, with *Parker v. Brown,* 317 U. S. 341; *cf. Mintz v. Baldwin,* 289 U. S. 346.

It is clear that the failure of the National Labor Relations Board to entertain foremen's petitions was of the

latter class. There was no administrative concession that the nature of these appellants' business put their employees beyond reach of federal authority. The Board several times entertained similar proceedings by other employees whose right rested on the same words of Congress. Neither did the National Board ever deny its own jurisdiction over petitions because they were by foremen. *Soss Manufacturing Co.*, 56 N. L. R. B. 348. It made clear that its refusal to designate foremen's bargaining units was a determination and an exercise of its discretion to determine that such units were not appropriate for bargaining purposes. *Maryland Drydock Co.*, 49 N. L. R. B. 733. We cannot, therefore, deal with this as a case where federal power has been delegated but lies dormant and unexercised.

Comparison of the State and Federal statutes will show that both governments have laid hold of the same relationship for regulation, and it involves the same employers and the same employees. Each has delegated to an administrative authority a wide discretion in applying this plan of regulation to specific cases, and they are governed by somewhat different standards. Thus, if both laws are upheld, two administrative bodies are asserting a discretionary control over the same subject matter, conducting hearings, supervising elections and determining appropriate units for bargaining in the same plant. They might come out with the same determination, or they might come out with conflicting ones as they have in the past. *Cf. Matter of Creamery Package Mfg. Co.*, 34 N. L. R. B. 108; Wisc. Emp. Rel. Bd. Case III, No. 348 E–117. But the power to decide a matter can hardly be made dependent on the way it is decided. As said by Mr. Justice Holmes for the Court, "When Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposi-

tion . . . ." *Charleston R. Co.* v. *Varnville Co.*, 237 U. S. 597, 604. See also *Southern Railway Co.* v. *Railroad Commission of Indiana,* 236 U. S. 439, 448; *Missouri Pacific R. R.* v. *Porter,* 273 U. S. 341, 345–6. If the two boards attempt to exercise a concurrent jurisdiction to decide the appropriate unit of representation, action by one necessarily denies the discretion of the other. The second to act either must follow the first, which would make its action useless and vain, or depart from it, which would produce a mischievous conflict. The State argues for a rule that would enable it to act until the federal board had acted in the same case. But we do not think that a case by case test of federal supremacy is permissible here. The federal board has jurisdiction of the industry in which these particular employers are engaged and has asserted control of their labor relations in general. It asserts, and rightfully so, under our decision in the *Packard* case, *supra,* its power to decide whether these foremen may constitute themselves a bargaining unit. We do not believe this leaves room for the operation of the state authority asserted.

The National and State Boards have made a commendable effort to avoid conflict in this overlapping state of the statutes. We find nothing in their negotiations, however, which affects either the construction of the federal statute or the question of constitutional power insofar as they are involved in this case, since the National Board made no concession or delegation of power to deal with this subject. The election of the National Board to decline jurisdiction in certain types of cases, for budgetary or other reasons presents a different problem which we do not now decide.

We therefore conclude that it is beyond the power of New York State to apply its policy to these appellants as

attempted herein. The judgments appealed from are reversed and the causes remanded for further proceedings not inconsistent herewith.

*Reversed.*

Separate opinion of MR. JUSTICE FRANKFURTER, in which MR. JUSTICE MURPHY and MR. JUSTICE RUTLEDGE join.

The legal issue in these cases derives from our decision in *Packard Motor Car Co.* v. *National Labor Relations Board,* 330 U. S. 485. The Court there held that foremen are "employees" within § 2 (3) of the National Labor Relations Act, 49 Stat. 449, 450, and as such are entitled to the rights of self-organization under the Act. As the *Packard* case points out, the exercise of this authority over foremen has had a chequered history before the National Labor Relations Board. There was a period when the Board in the exercise of its discretion denied resort to its authority by foremen seeking collective bargaining representation. During that period, foremen of the two petitioning steel companies invoked the jurisdiction of the New York State Labor Board to certify them as a bargaining unit under the New York law descriptively characterized as a "Little Wagner Act" because it enforces the same policies by the same means as does the Wagner Act. The State Board assumed jurisdiction and the New York Court of Appeals sustained that assumption. Our problem is whether the National Labor Relations Act in its entirety—the law as Congress gave it to the National Board for administration—precluded this exercise of State authority.

If the Court merely held that, having given the National Board jurisdiction over foremen Congress also gave it discretion to determine that it may be undesirable, as a matter of industrial relations, to compel recognition of foremen's unions; that the Board had so exercised its discretion

and, by refusing to sanction foremen's unions, had determined that foremen in enterprises like those before us could not exact union recognition; that therefore New York could not oppose such federal action by a contrary policy of its own, I should concur in the Court's decision, whatever the differences of interpretation to which the course of events before the National Board may lend itself. But the Court's opinion does not, as I read it, have that restricted scope, based on the individual circumstances before us. Apart from the suggestion that the National Board's declination of jurisdiction "in certain types of cases, for budgetary or other reasons" might leave room for the State in those situations, the Court's opinion carries at least overtones of meaning that, regardless of the consent of the National Board, New York is excluded from enforcing rights of collective bargaining in all industries within its borders as to which Congress has granted opportunity to invoke the authority of the National Board.

The inability of the National Board to exercise its dormant powers because of lack of funds ought not to furnish a more persuasive reason for finding that concurrent State power may function than a deliberate exercise of judgment by the National Board that industrial relations having both national and state concern can most effectively be promoted by an appropriate division of administrative resources between the National and the State Boards. This states abstractly a very practical situation. Based on the realization that as a practical matter the National Board could not effectuate the policies of the Act committed to it over the whole range of its authority, an arrangement was worked out whereby the National Board leaves to the State Board jurisdiction over so-called local industries covered by the federal Act, while the State Board does not entertain matters over which the National Board has consistently taken jurisdiction. This practical Federal-State working arrangement, arrived at by those

carrying the responsibility for breathing life into the bare bones of legislation, is so relevant to the solution of the legal issues arising out of State-Nation industrial interaction, that I have set forth the agreement in full in an Appendix. Particularly when dealing with legal aspects of industrial relations is it important for courts not to isolate legal issues from their workaday context. I cannot join the Court's opinion because I read it to mean that it is beyond the power of the National Board to agree with State agencies enforcing laws like the Wagner Act to divide, with due regard to local interests, the domain over which Congress had given the National Board abstract discretion but which, practically, cannot be covered by it alone. If such cooperative agreements between State and National Boards are barred because the power which Congress has granted to the National Board ousted or superseded State authority, I am unable to see how State authority can revive because Congress has seen fit to put the Board on short rations.

Since we are dealing with aspects of commerce between the States that are not legally outside State action by virtue of the Commerce Clause itself, New York has authority to act so long as Congress has not interdicted her action. While what the State does she does on sufferance, in ascertaining whether Congress has allowed State action we are not to consider the matter as though Congress were conferring a mere bounty, the extent of which must be viewed with a thrifty eye. When construing federal legislation that deals with matters that also lie within the authority, because within the proper interests, of the States, we must be mindful that we are part of the delicate process of adjusting the interacting areas of National and State authority over commerce. The inevitable extension of federal authority over economic enterprise has absorbed the authority that was previously left to the States. But in legislating, Congress is not indulging in doctrinaire,

hard-and-fast curtailment of the State powers reflecting special State interests. Federal legislation of this character must be construed with due regard to accommodation between the assertions of new federal authority and the functions of the individual States, as reflecting the historic and persistent concerns of our dual system of government. Since Congress can, if it chooses, entirely displace the States to the full extent of the far-reaching Commerce Clause, Congress needs no help from generous judicial implications to achieve the supersession of State authority. To construe federal legislation so as not needlessly to forbid preexisting State authority is to respect our federal system. Any indulgence in construction should be in favor of the States, because Congress can speak with drastic clarity whenever it chooses to assure full federal authority, completely displacing the States.

This is an old problem and the considerations involved in its solution are commonplace. But results not always harmonious have from time to time been drawn from the same precepts. In law also the emphasis makes the song. It may make a decisive difference what view judges have of the place of the States in our national life when they come to apply the governing principle that for an Act of Congress completely to displace a State law "the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together." *Sinnot* v. *Davenport*, 22 How. 227, 243. Congress can speak so unequivocally as to leave no doubt. But real controversies arise only when Congress has left the matter in doubt, and then the result depends on whether we require that actual conflict between State and federal action be shown, or whether argumentative conflict suffices.

Our general problem was only recently canvassed in the three opinions in *Hill* v. *Florida,* 325 U. S. 538. But the

frequent recurrence of the problem and the respective legislative and judicial share in its proper solution justify some repetition. It may be helpful to recall the circumspection with which federal absorption of authority previously belonging to the States was observed in the control of railroad rates.

In the *Minnesota Rate Cases*, 230 U. S. 352, this Court, after elaborate argument and extended consideration, held that State rates covering intrastate transportation could not be stricken down judicially even though it may be shown that such rates adversely affect carriers in their interstate aspects. This decision was based largely on the respect to be accorded to the respective functions of State and national authority, as evinced by Congressional and judicial history. But a year later, the Court held that when the Interstate Commerce Commission found that State regulation of local rates was designed to operate discriminatorily against related interstate commerce, the Interstate Commerce Act authorized removal of the discrimination against the interstate rates. *Houston, East and West R. Co.* v. *United States,* 234 U. S. 342. Nevertheless, so important did this Court deem respect for State power that it would not allow the *Shreveport* doctrine to be loosely used as a curtailment of State authority. Accordingly, it insisted on precision and definiteness in the orders of the Interstate Commerce Commission in this interacting area. *Illinois Central R. Co.* v. *State Public Utilities Commission,* 245 U. S. 493. Subsequently, by the Transportation Act of 1920, Congress formalized the *Shreveport* doctrine and extended its scope. The Commission was expressly authorized to correct State rates that were unreasonable with reference to related interstate rates, and was also given control over State rates which adversely affected interstate commerce as such. See § 13, par. 4 of the Interstate Commerce Act, as amended by

§§ 416 and 422 of the Transportation Act of 1920, 41 Stat. 456, 484, 488; *Wisconsin Railroad Commission* v. *C. B. & Q. R. R. Co.,* 257 U. S. 563; *New York* v. *United States,* 257 U. S. 591. It is not without significance that in exercising this new power Congress associated with the Interstate Commerce Commission the appropriate State agencies in an advisory capacity. Even where foreign commerce is involved, as to which State control is naturally viewed with less favor, this Court has not ruled out State authority derived from a State interest where State regulation was found to be complementary to federal regulation. *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202, 208–09.

No doubt, as indicated, cases have not always dealt with such scrupulous regard for State action where Congress has not patently terminated it. Metaphor—"occupied the field"—has at times done service for close analysis. But the rules of accommodation that have been most consistently professed as well as the dominant current of decisions make for and not against the *modus vivendi* achieved by the two agencies in the labor relations field, which the Government, as *amicus curiae,* here sponsored. Such an arrangement assures the effectuation of the policies which underlie both the National Labor Relations Act and the "Little Wagner Act" of New York in a manner agreed upon by the two Boards for dealing with matters affecting interests of common concern. "Where the Government has provided for collaboration the courts should not find conflict." *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202, 209.

What is before us is a very real and practical situation. The vast range of jurisdiction which the National Labor Relations Act has conferred upon the Board raises problems of administration wholly apart from available funds. As a result of this Court's decision in *National Labor Relations Board* v. *Fainblatt,* 306 U. S. 601, untold

small enterprises are subject to the power of the Board. While labor difficulties in these units in the aggregate may unquestionably have serious repercussions upon interstate commerce, in their individualized aspects they are equally the concern of their respective localities. Accordingly, the National Labor Relations Board, instead of viewing the attempt of State agencies to enforce the principles of collective bargaining as an encroachment upon national authority, regards the aid of the State agencies as an effective means of accomplishing a common end. Of course, as Mr. Justice Holmes said, "When Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition" to save the State law. But surely this is so only when the State seeks "to enforce a state policy differently conceived . . . ." *Charleston & Western Carolina R. R. Co.* v. *Varnville Furniture Company,* 237 U. S. 597, 604.

The National Board's business explains the reason and supports the reasonableness behind its desire to share burdens that may be the State's concern no less than the Nation's. The Board's Annual Reports show increasing arrears. At the end of the fiscal year 1944, 2602 cases were pending; at the end of 1945, 3244; at the end of 1946, there were 4605 unfinished cases. A shrewd critic has thus expressed the considerations that in the past have often lain below the surface of merely doctrinal applications: "Formally the enterprise is one of the interpretation of the Act of Congress to discover its scope. Actually it is often the enterprise of reaching a judgment whether the situation is so adequately handled by national prescription that the impediment of further state requirements is to be deemed a bane rather than a blessing." T. R. Powell, *Current Conflicts Between the Commerce Clause and State Police Power,* 12 Minn. L. Rev. 607. In the submission by the Board before us, we have the most authorita-

tive manifestation by national authority that State collaboration would be a blessing rather than a bane, and yet judicial construction would forbid the aid which the agency of Congress seeks in carrying out its duty. It is surely a responsible inference that the the result will be to leave uncontrolled large areas of industrial conflict. Neither what Congress has said in the National Labor Relations Act, nor the structure of the Act, nor its policy, nor its actual operation, should be found to prohibit the Board from exercising its discretion so as to enlist the aid of agencies charged with like duties within the States in enforcing a common policy by a distribution of cases appropriate to respective State and National interests.

## APPENDIX.

Documents Indicating Understanding Between the New York and the National Labor Relations Boards

NEW YORK STATE LABOR RELATIONS BOARD
250 West 57th Street
NEW YORK 19

WILLIAM E. GRADY, Jr.
General Counsel

JULY 10, 1945.

ALVIN J. ROCKWELL, Esquire
*General Counsel,*
*National Labor Relations Board,*
*Washington, D. C.*

DEAR MR. ROCKWELL: The Board has examined your memorandum of our conference of April 20, 1945 and considers that it represents a fair statement of the proceedings.

As to insurance companies (page 6 of your memo), you will recall that we mentioned our prior experience with

such companies and the fact that units of less than state-wide scope have been established and upheld by the courts. In such cases, therefore, we think it would be to the benefit of both Boards that you clear with us. A situation may very easily arise in which you would prefer to have us entertain a petition which had been filed with us.

Best regards.

Sincerely,

/s/ WILLIAM E. GRADY, Jr.

---

NATIONAL LABOR RELATIONS BOARD,
*Washington 25, D. C., July 26, 1945.*

WILLIAM E. GRADY, Jr.,
*General Counsel,*
*New York State Labor Relations Board,*
*250 West 57th Street,*
*New York City 19, N. Y.*

DEAR MR. GRADY: In Mr. Rockwell's absence on vacation this week, I am replying to your letter of July 10.

Mr. Rockwell's memorandum of our conference of April 20 and your letter were discussed with and approved by the Members of the Board.

We are, accordingly, circulating copies of this memorandum to the members of our staffs in the Buffalo and New York City offices. This memorandum and your letter will hereafter be followed as a guide in relations between the two Boards as regards cases arising in New York State.

Sincerely yours,

/s/ Oscar S. Smith
OSCAR S. SMITH,
*Director of Field Division.*

MEMORANDUM RE CONFERENCE BETWEEN REPRESENTA-
TIVES OF NEW YORK STATE LABOR RELATIONS BOARD
AND NATIONAL LABOR RELATIONS BOARD, HELD FRIDAY,
APRIL 20, 1945

A conference was held at the offices of the New York
State Labor Relations Board on Friday, April 20, 1945,
attended by Father Kelley, Chairman, and Board Mem-
bers Goldberg and Lorenz, Executive Secretary Goldberg,
General Counsel Grady, and Associate General Counsel
Feldblum, of the New York State Labor Relations Board,
and by Field Director Smith, New York Regional Director
Howard LeBaron, General Counsel Rockwell, and New
York Regional Attorney Perl, of the National Labor Rela-
tions Board. The subject of the conference was the
proper division of jurisdiction between the National and
State Boards.

This conference followed an earlier conference held on
January 9, 1945, in Washington, between Messrs. Smith
and Rockwell and Buffalo Regional Director Ryder, rep-
resenting the NLRB, and Messrs. Goldberg and Feldblum,
representing the New York Board. At the conference in
Washington, the principal subject discussed was the action
of the State Board in entertaining election petitions in-
volving the employees of large interstate manufacturing
establishments over which the National Board has cus-
tomarily asserted jurisdiction. The cases in question
related to petitions filed by labor organizations which
sought to be certified as representatives of units of super-
visory employees or, in one case, a labor organization
which sought to represent non-supervisory employees but
whose membership was composed of a substantial number
of supervisors. At the time of the January conference,
the Board's decision in the *Packard* case, 61 N. L. R. B.,
No. 3, had not been issued; it appeared that in certifying
a labor organization for supervisory employees the State

Board was taking action contrary to that which would have been taken by the National Board had the petition been filed with it. It was also believed that the action of the State Board in proceeding to a certification of a labor organization for non-supervisory employees whose membership included supervisors in substantial number might be contrary to the National Board's disposition of the case under its decision in *Matter of Rochester & Pittsburgh Coal Co.*, 56 N. L. R. B. 1760. No understanding was reached with regard to these types of cases at the January conference. In the meantime, on March 26, 1945, the Board issued its decision in the *Packard* case, holding that it would proceed to certify unaffiliated unions as representative of supervisory employees and leaving open the question of whether it would proceed to certify affiliated unions as such representatives. The New York conference was arranged in order to discuss the types of cases which were the subject of the January conference and also to canvass in general the question of the respective jurisdictions of the two Boards.

The New York conference began with consideration of Father Boland's letter to Mr. Madden dated July 12, 1937, which has constituted the principal basis of understanding between the two Boards during the ensuing years. The Boland letter states:

> Unless there are unusual circumstances, the New York State Labor Relations Board will assume jurisdiction over all cases arising in the following trades and industries, without clearing, except as a matter of record, with the National Board's officials:
>
> 1. Retail stores,
> 2. Small industries which receive all or practically all raw materials from within the State of New York, and do not ship any material proportion of their product outside the State,
> 3. Service trades (such as laundries),

4. Office and residential buildings,

5. Small and clearly local public utilities, (This includes local traction companies, as well as gas and electric light corporations.)

6. Storage warehouses,

7. Construction operations,

8. Other obviously local businesses.

A copy of the letter of July 12, 1937, is attached to this memorandum.

At the time of the preparation of the letter of July 12 and the conference which preceded it and upon which it is based, there was relatively little case law as to the jurisdiction under the commerce clause of the National Board under the National Act. Since that time there has been a large number of decisions in the federal circuit courts of appeals and several in the Supreme Court which have substantially extended the Board's jurisdiction beyond that which was understood to exist in July 1937. To take only one pertinent example: In July 1937 the Board had not asserted jurisdiction over retail establishments. Since 1937 the Board has accepted a considerable number of cases involving retail establishments such as department stores and the Board's power in this respect has been sustained by the courts. Notwithstanding this extension of jurisdiction under the National Act, the National and State Boards, respectively, have, in general, followed the understanding reflected by the letter of July 12, 1937. Thus, in New York State the National Board has not asserted jurisdiction over retail establishments. The representatives at the conference of April 20 expressed the view that, by and large, the understanding had worked out well as applied to the types of businesses there dealt with. The position was repeatedly expressed by the representatives of both National and State Boards that as a working matter the jurisdiction between the two Boards must be allotted on the basis of the type of indus-

try or business involved (rather, for example, than on the basis of which Board a petition or charge is initially filed with), and that when one Board, pursuant to common understanding, has asserted jurisdiction in the past over a particular employer, the other Board should thereafter refer any matters coming to it to the Board which had entertained the earlier case or cases.[1]

Following reference to the letter of July 12, there was detailed discussion of the eight categories there listed, which are quoted above. The gist of this discussion was as follows: *Retail stores.* Where the same company operates retail stores and also does a substantial interstate mail order business from within New York State, representatives of the National Board pointed out that probably the National Act should be applied to the company. The understanding was reached that before the State Board asserted jurisdiction in the future over any such companies, the case would be cleared with the National Board through the New York City or Buffalo offices, depending upon the region in which the case arose. *Service trades.* Where a New York concern is in the business of furnishing guards, window washers, laundry, or some other type of service within the State, it was felt that the business is essentially local in character and should be subject to the State Act even though the services are

---

[1] In *Consolidated Edison Co.* v. *N. L. R. B.*, 305 U. S. 197, 223, the Supreme Court indicated that in deciding whether or not to assert jurisdiction the National Board could properly take into account the existence of State protective legislation, such as the New York State Labor Relations Act.

The National Act contains no provision authorizing the National Board to enter into compacts or agreements with State Boards, but would seem to require the National Board in each case to exercise its discretion whether or not to proceed. It is believed, nevertheless, that understandings such as that embodied in the letter of July 12, 1937, although of no legal effect, assist both Boards in determining the proper disposition of particular cases as they arise.

furnished to a number of large interstate enterprises, which in themselves are subject to the jurisdiction of the National Act. (An exception is the case of detective agencies doing business on a national scale, concerning which, it is understood, the State Board will clear with the National Board before asserting jurisdiction.) On the other hand, where the interstate enterprise, over which the National Board would customarily assert jurisdiction, supplies its own guard, window washing, laundry, or other service for itself, it was believed that the employees involved would rightly come within the jurisdiction of the National Act. The test here is whether the service is performed by a separate business establishment which can properly be considered a local enterprise, even though services are rendered to interstate businesses, or whether the service is rendered by the interstate enterprise itself as an incident of its own business. *Office buildings.* The same test applicable to the service trades was also thought to be applicable to office buildings. Thus, if the employer involved is in the business of operating office buildings he is subject to the State Act even though tenants consist of interstate enterprises. On the other hand, where the office building is owned or operated, or both, by an interstate enterprise, over which the National Board would customarily assert jurisdiction, and is used by the interstate enterprise in conducting its interstate business, the National Board would expect to assert jurisdiction. *Public utilities.* It was agreed that the New York Board could properly assert jurisdiction over such utilities, including electric, gas, traction, bus companies, and the like which are not themselves engaged in supplying service across the State line. In short, where the National Board could only base its jurisdiction on the "affecting commerce" principle (plus the shipment into the State of fuel and capital equipment, not for resale), it was believed in general that the National Board

could properly leave jurisdiction to the State Board. An exception to this working rule is provided by a few very large utilities, such as the Consolidated Edison Company, over which the National Board originally asserted jurisdiction. *Warehouses.* The test applied in the case of service trades and office buildings seems applicable to warehouses, the question being whether they are operated as separate local enterprises or as incidents of the operation of interstate business over which the National Board would customarily take jurisdiction. *Construction business.* The New York Board is expected to assert jurisdiction over the construction industry except, for example, in the case of the construction of ships, which is thought of as falling within the field of manufacturing, over which, in general, the National Board asserts jurisdiction.

In addition to the foregoing lines of activity, referred to in the letter of July 12, 1937, two other businesses not dealt with in that letter were also discussed. *Insurance companies.* In the past both the State and the National Boards have intermittently asserted jurisdiction over insurance companies. So far as small insurance, bonding, casualty companies, etc., doing business primarily within the State are concerned, it was felt that the State Board should occupy this field. So far as the large national companies are concerned, however, the representatives of the National Board expressed the view that hereafter cases involving such companies should be handled by the latter Board. In this connection it was pointed out that as organization has matured among the large companies, State-wide and even larger units are being established and that this type of activity had therefore advanced to the stage where it was peculiarly the interest of the National Board. It was agreed that the State Board would not entertain any cases involving the large national companies without prior clearance with the National Board. *Newspapers.* The National Board has taken jurisdiction

over large daily newspapers in New York and other States and, where challenged, has been uniformly sustained in this by the courts. At the same time, the circulation departments of such newspapers, to the extent that the distributing activity is confined within a single State, are in many aspects local in character. In New York State, and particularly in New York City, where news vendors are subject to local licensing requirements, the National Board feels that cases involving the distribution of newspapers should properly be handled by the State Board. Consistent with this approach, the New York Regional Office of the National Board has recently referred to the State Board news vendor cases involving four of the largest afternoon newspapers in New York City. The representatives of the State Board expressed agreement with this approach and indicated that the proper line of division might come at the level of the circulation managers. It was agreed that hereafter neither Board will accept cases at the circulation manager level without prior clearance with the other Board; that cases above this level will be handled by the National Board; and that cases below this level will be handled by the State Board. Of course, small newspapers of limited circulation will properly be handled by the State Board.

*Concurrent jurisdiction.*[2] The letter of July 12, 1937, left open the question of "concurrent jurisdiction"—by which, it is understood, was meant the procedure to be followed in the case of employers who might simultaneously be subject to the requirements of both the State and National Acts. The letter stated: "So far as concurrent jurisdiction is concerned, we assume that even a tentative understanding must await mutual study of the memorandum which Mr. Fahy is now preparing." It

---

[2] See *Davega-City Radio, Inc.* v. *New York Labor Relations Board,* 281 N. Y. 13; 22 N. E. 2nd 145; 4 L. R. R. Man. 899. (July 11, 1939.)

appears that the memorandum referred to was never prepared and that no subsequent understanding was reached as to such concurrent jurisdiction. In practice, this does not seem to have been a problem, except in the situation discussed below, since the State Board has by and large confined its activities to the businesses detailed in the letter of July 12 and the National Board in turn has left this field open to the State Board. The problem of so-called "concurrent jurisdiction" has arisen in recent months because, following the National Board's decision in *Matter of Maryland Drydock Company*, 49 N. L. R. B. 733, a number of labor organizations have filed election petitions with the State Board which they knew would not be entertained by the National Board. (See the second paragraph of this memorandum, above, concerning the conference of January 9, 1945, in Washington.) Prior to the *Maryland Drydock* case, the State Board, it is understood, had refrained from entertaining cases involving large interstate manufacturers and the National Board had asserted exclusive jurisdiction over such employers.

At the conference of April 20 the representatives of the National Board pointed to the recent decision in the *Packard* case and suggested that the State Board should adhere to its general policy of leaving all cases involving large manufacturing establishments doing interstate business to the National Board. The impracticability of both Boards intermittently asserting jurisdiction over the same employer was emphasized, and in addition the question was raised whether under the Federal Constitution the State Board could lawfully enforce any requirement against such employers which was inconsistent with or which imposed restraints in addition to those enforced by the National Board. The representatives of the New York Board agreed that cases of this type presented a legal problem but were of the view that it was advisable

for the State Board to entertain election petitions for units of supervisory employees where it was doubtful whether the National Board would proceed with the case were it filed with the latter Board. The representatives of the New York Board pointed to their obligation to contribute to the maintenance of industrial peace within the borders of New York State and recalled a provision of the New York Constitution which guarantees organizational rights to all employees. The representatives of the latter Board agreed, however, that their officials should not reach out for cases of this character, involving large interstate manufacturers, and that they would keep the National Board advised as to all such cases they decided to entertain. Thus, no broad understanding was reached on this score, both Boards reserving their respective positions with regard to petitions for units of supervisory employees and other petitions involving large interstate manufacturers.

It was believed that it would be helpful to the work of both Boards if lists of cases entertained within the State were periodically exchanged. The details of this were left to be worked out.

---

NEW YORK STATE LABOR RELATIONS BOARD,
*July 12, 1937.*

Honorable J. WARREN MADDEN,
*National Labor Relations Board,*
*Washington, D. C.*

DEAR MR. MADDEN: We wish, in the first place, to thank you and your colleagues for your warm reception of last Wednesday. It is gratifying to know that we can look forward to such wholehearted cooperation from your Board and its staff. We will gladly reciprocate.

As requested, we outline our recollection of the understandings reached. So far as concurrent jurisdiction is

concerned, we assume that even a tentative understanding must await mutual study of the memorandum which Mr. Fahy is now preparing.

Unless there are unusual circumstances, the New York State Labor Relations Board will assume jurisdiction over all cases arising in the following trades and industries, without clearing, except as a matter of record, with the National Board's officials:

1. Retail stores,
2. Small industries which receive all or practically all raw materials from within the State of New York, and do not ship any material proportion of their product outside the State,
3. Service trades (such as laundries),
4. Office and residential buildings,
5. Small and clearly local public utilities, (this includes local traction companies, as well as gas and electric light corporations),
6. Storage warehouses,
7. Construction operations,
8. Other obviously local businesses.

Clearance is certainly going to be required in the case of industries where the raw materials or most of them come from without the State, but the product is not shipped beyond the borders of New York. (The question here is as to the breadth of application of the "come to rest" doctrine of the *Schechter* case.)

You are familiar, of course, with Section 715 of our statute, part of which reads as follows: "Application of article. The provisions of this article shall not apply to the employees of any employer who concedes to and agrees with the board that such employees are subject to and protected by the provisions of the national labor relations act or the federal railway labor act . . .". The New York State Board will undoubtedly take the position that the

words "agrees with" contemplate the necessity of our Board's agreeing with the employer that his employees are subject to the national statute, and that no employer can by unilateral action select his jurisdiction.

This however, does not solve all of the problems created by the Section, since it is clear that even the agreement of this Board with the employer will not necessarily bestow federal jurisdiction under the Constitution. Presumably every time such a concession is proffered by an employer, our Board will have to clear with the National Board officials in the same way it would clear with them if no such concession were made.

It is our understanding that we should clear on all questions of jurisdiction with the Regional Directors in New York City and Buffalo in the first instance, and that you will instruct your Directors to reciprocate by clearing with us all doubtful cases which first come to their attention.

Whenever this Board and either of your Regional Directors find themselves unable to agree, the matter will be taken up with you at once.

We would appreciate knowing that your recollection and understanding of the above are in accord with our own.

Very sincerely yours,
s/   John P. Boland
(Dr.) JOHN P. BOLAND, *Chairman.*

---

NATIONAL LABOR RELATIONS BOARD

MINUTES OF AUGUST 16, 1946

An informal inquiry was made to the Board by United Financial Employees Association asking whether the Board would entertain a Section 9 representation petition on behalf of the employees of Harris Upham and Company, a New York brokerage house. The Board was also

advised that similar petitions were contemplated for the employees of a number of similar New York brokerage houses. The Board concluded that it would not, at this time, entertain a petition filed on behalf of the employees of Harris Upham and Company or other such brokerage houses because of budgetary and other administrative considerations. The Board further concluded that, in view of this disposition, it had no objection to having the State Labor Relations Board of the State of New York entertain such petitions filed under the State Act.

Dated at Washington, D. C.
August 16, 1946.

Donn N. Bent
DONN N. BENT,
*Executive Secretary.*

Approved:
s/ P. M. H.
s/ J. M. H.

Certified to be a true and correct copy.
s/ Donn N. Bent,
DONN N. BENT,
*Executive Secretary.*